WALTER C. HAMANN *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. JOZEF SUMICHRAST *et al.*, Defendants (The City of Lake Forest, Defendant-Appellee and Cross-Appellant).

Second District   No. 2—91—0248

Opinion filed December 16, 1991.

Ardath A. Hamann, of Lake Bluff, for appellants.

Conzelman, Snarski & Stepanich, of Waukegan, Semmelman & Bertucci, Ltd., of Lake Forest, and John E. Helander, of O'Halloran, Kosoff & Miller, of Northbrook (Murray R. Conzelman, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiffs, Walter Hamann and Lila Hamann, appeal from the judgment of the circuit court of Lake County finding that the subdivision in which plaintiffs reside is not a common-law subdivision and that the Lake Forest zoning ordinance pertaining to the 20,000-square-foot minimum lot size requirement for single-family residences is not unconstitutional as applied to their lot. Additionally, plaintiffs appeal from that portion of the judgment rendering moot the issue of whether Lake Forest's lot-in-depth subdivision section of the zoning ordinance is reasonable as applied to plaintiffs' lot. Defendant City of Lake Forest (city) cross-appeals from the trial court's determination that plaintiffs have easement rights in streets that have been partially vacated. Defendants Jozef and Susan Sumichrast and John and Jane Carpender are not parties to this appeal.

In 1956 plaintiffs purchased lot 4 in unit 2 of the Whispering Oaks subdivision and had a single-family residence constructed upon it. At the time of their purchase plaintiffs knew their property was zoned "R-2," single-family dwellings on lots of not less than 20,000 square feet. Plaintiffs' lot measured 100 feet wide by 377.6 feet long and was, therefore, 37,760 square feet in area.

Plaintiffs' lot is bordered on the east by a dedicated, but unimproved and wooded, right-of-way, Western Avenue. Immediately to the east of Western Avenue are the Chicago and North Western railway tracks. On the west, lot 4 is bordered by Beverly Place, an improved street, on the north by lot 3 of the same subdivision, and on the south by lot 29, a lot in unit 3 of the Whispering Oaks subdivision. Lot 29 and 19 other lots lying to the south of plaintiffs' property have substantially the same size and configuration as plaintiffs' property. Each lot is occupied by a single residence.

Defendants John and Jane Carpender own lot 3, which measured 377.6 long by 117.78 feet wide, or 44,466 square feet in area. Lot 3 is bounded on the north by a dedicated street, Briar Lane. Briar Lane connects Beverly Place with Western Avenue and, until 1990, was unimproved. On the north side of Briar Lane is lot 2, owned by defendants Jozef and Susan Sumichrast and measuring 377.6 feet long by 130 feet wide, or 49,000 square feet in area. To the north of lot 2 is lot 1, which was subdivided into two lots in 1974 and is now known as Black's subdivision. A house located on the western half of lot 1 fronts on Beverly Place. Another house, located on the eastern half of the lot, has access to Beverly Place by means of a long driveway. The eastern half of lot 1 is known as a lot-in-depth or flagpole lot.

The Sumichrasts purchased lot 2 in 1987 and soon thereafter began proceedings with the city to divide the property into two lots. The original proposed plan of subdivision, plan A, provided that Briar Lane be improved from Beverly Place to Western Avenue. The city's planning staff recommended, instead, plan B, which provided for the improvement of Briar Lane from Beverly Place east approximately 250 feet and ending in a cul-de-sac. Under plan B, the northern half of Briar Lane and east from the end of the cul-de-sac to Western Avenue was to be vacated and incorporated into the Sumichrasts' rear lot. Plaintiffs objected to plan B at meetings of the planning commission, urban and environmental affairs committee, and city council. Plaintiffs claimed they had easement rights in Briar Lane under the covenants running with the land as recorded in the declaration of restrictions and plat for unit 2 of the subdivision. Plaintiffs maintained that these rights would be blocked under plan B. The planning commission and the city council eventually approved plan B.

Lot 2 was subdivided into two parts. The western half fronted on Beverly Place and included the original house in which the Sumichrasts resided. The eastern half fronted on the northern side of Briar Lane at the end of the cul-de-sac. At the time of trial no house had yet been constructed on the eastern half.

Subsequent to the approval of plan B by the city, plaintiffs brought an action for permanent injunction and declaratory judgment against the Sumichrasts. Plaintiffs asserted that unit 2 of the Whispering Oaks subdivision was a common-law subdivision and, as such, their lot was large enough to divide into two lots. As access to the rear half of plaintiffs' lot would be by Briar Lane to Western Avenue, plaintiffs would be irreparably damaged if the Sumichrasts built on the Briar Lane right-of-way. Plaintiffs further asserted that such construction would deny them access to the rear half of their lot and would breach the covenants running with the land. Plaintiffs sought a permanent injunction preventing the Sumichrasts from building on the Briar Lane right-of-way and a judgment declaring their rights of ingress and egress in Briar Lane.

After plaintiffs had instituted their litigation against the Sumichrasts, plaintiffs received a certified letter from defendant Jane Carpender notifying them that she had filed an application with the city requesting a subdivision of her property (lot 3) into two buildable lots. As a result, the court determined that the city and the Carpenders were necessary parties to the plaintiffs' litigation and ordered that they be joined as party defendants. Shortly thereafter, the city granted the Carpenders' request for subdivision and also approved a plan to vacate and incorporate the southern half of Briar Lane east from the end of the cul-de-sac to Western Avenue into the Carpenders' lot.

The western half of lot 3 fronted on Beverly Place and included the original house in which Jane Carpender resided. The eastern half fronted on the southern side of Briar Lane at the end of the cul-de-sac. No house has yet been built on the eastern half.

At trial plaintiffs placed into evidence the 1955 official plan of the city, the city's zoning ordinance of 1923 as amended in 1955, a blueprint of the original plat of unit 2 of the Whispering Oaks subdivision, and a declaration of restrictions pertaining to the subdivision, all of which plaintiffs relied upon in purchasing their property. Walter Hamann testified that he particularly relied upon the information on the blueprint pertaining to the location of plaintiffs' lot on Beverly Place and the dedication of Western Avenue and Briar Lane. Hamann stated that he read the declaration of restrictions prior to purchasing lot 4. According to the declaration, the restrictions, or covenants, were to run with the land until January 1, 1980, at which time they would be automatically extended for successive periods of 10 years unless a majority of the lot owners voted to change the covenants.

While testifying, both Lila and Walter Hamann opined that the value of the rear portion of their lot, if subdivided and built upon, would be $300,000, whereas, if not subdivided, it would be worth $20,000 or $30,000. Plaintiffs also opined that subdivision of their property would not damage property values in the city or harm the public health, safety, morals, or general welfare of the community.

On cross-examination, Lila Hamann acknowledged that the square footage of the Sumichrasts' and Carpenders' lots was large enough to accommodate two 20,000-square-foot lots and that plaintiffs' lot, measuring 37,760 square feet, was not sufficient.

On cross-examination, Walter Hamann agreed that the Sumichrasts' and Carpenders' lots were more than 40,000 square feet in area. Mr. Hamann acknowledged that the 20 lots south of his lot were substantially the same in size, 100 feet by 377.6 feet, and in configuration as his lot. He would not admit that his lot was smaller than 40,000 square feet in size, stating only that in his opinion it measured more than 40,000 square feet.

Norman Drummond, a city planner consultant, testified on behalf of plaintiffs. Drummond recounted the various documents he reviewed in preparing for his testimony, including the city's 1955 comprehensive plan, the city's 1955 and current zoning ordinances, and the plats of units 2 through 5 of the Whispering Oaks subdivision. Drummond stated that in 1955 the dedicated streets in unit 2 were Beverly Place, Briar Lane, and Western Avenue. At the time, Western Avenue and Briar Lane east of Beverly Place were not improved. Western Avenue remains unimproved but the western half of Briar Lane east of Beverly Place was, according to the witness, being currently improved.

Drummond stated that he knew of no health, safety, moral or general welfare concerns which would prevent subdividing lots 1, 2, 3 or 4 in unit 2. According to Drummond, the only difference between lots 1, 2, 3 and lot 4 was that lot 4 was an interior lot. The three other lots were corner lots and slightly larger. Drummond testified that he calculated the buildable area of the rear half of lot 3, the Carpenders' lot, and lot 4, plaintiffs' lot. If the vacated portion of Briar Lane north of lot 3 was not considered in the calculations, *i.e.*, if it was considered as originally platted, the buildable rear area of the Carpenders' lot was smaller than the buildable rear area of the plaintiffs' lot.

Drummond testified that a flag lot and a lot-in-depth were essentially the same thing. Both required a greater width than normal. In an R-2 district, a width of 150 feet was required. Drummond opined that the lot-in-depth subdivision requirements of the city's zoning ordi-

nance were not reasonable as applied to plaintiffs' property because the physical nature of the property and its excessive depth lent it to the addition of a house on the rear portion of the lot. Additionally, because the lot-in-depth subdivision required the front and rear lot to share a common driveway, the extra width required for the subdivision was unnecessary and burdensome.

Drummond opined that the 20,000-square-foot lot size required by the zoning ordinance was also unreasonable as applied to plaintiffs' lot and other similar lots to the south of lot 4, which back up to the unimproved Western Avenue right-of-way, because it precluded further development. Drummond stated that because plaintiffs' lot backed up to a nonexistent street beyond which were a railway track, walking path, and then another street, no crowding would occur by further development of plaintiffs' property. Drummond added that because the rear portion of the property was heavily wooded, it could be developed without any visual, or other, impact on neighboring properties. To the extent that the other lots lying to the south of plaintiffs' lot were comparable to lot 4, they should, according to Drummond, also enjoy the potential for subdivision. When asked if subdivision of plaintiffs' property would set a precedent from a zoning standpoint, Drummond replied, "[S]imilar properties deserve to be treated similarly." Drummond stated that if plaintiffs' lot was divided in half, each half would measure 18,880 square feet in size, less square footage than required by the 20,000-square-foot requirement of the zoning ordinance.

Drummond acknowledged that in some limited sense the 20,000-square-foot requirement and the lot-in-depth subdivision requirements maintained open space. In this situation, however, no useable open space would result from enforcement of the requirements because the whole community would not benefit from plaintiffs' extra-deep wooded backyard. Drummond believed that two single-family dwellings represented the highest and best use of plaintiffs' property because, as the property presently existed, it was underdeveloped and larger than necessary. Additionally, in his view, the city needed more buildable lots of approximately 20,000 square feet.

Four expert witnesses testified on the city's behalf. Charles Crook, director of planning and development for the city, identified various exhibits, including certified copies of plats of units 1 through 6 of the Whispering Oaks subdivision, plats of other surrounding subdivisions, a copy of the city's comprehensive plan adopted in 1978 and amended in 1989, the city's current zoning ordinance, and a map of the city showing the different zoning districts. Crook testified that the

city had a comprehensive plan since 1929 and that the primary goal of the plan was to ensure orderly and planned development of the community. According to Crooks, plaintiffs' property was presently in compliance with the comprehensive plan. The zoning of the property was also in compliance with the plan.

Crook related that the city had begun zoning property in 1923 and that the subdivisions shown on the plats had been developed in accordance with that zoning. Unit 2 of Whispering Oaks, which was subdivided in 1955, was zoned R-2 at that time and had always remained R-2. Crook stated that the minimum lot size in a R-2 district was 20,000 square feet. According to the city's zoning ordinance, minimum lot area was defined as "that area of a lot in any zoning district, exclusive of the area of any street, road, private road, or access area or access easement on or across such lot." Applying this definition to plaintiffs' property, Crook stated that just the area within plaintiffs' lot lines could be considered in determining the lot size.

Crook opined that allowing plaintiffs to subdivide their property would establish a planning precedent because other properties similar in size and shape would have to be treated similarly. Thus, the 20 lots to the south of plaintiffs would receive the same treatment. Such subdivision would, in Crook's opinion, be contrary to the zoning established for the area. Additionally, it would have a deleterious effect on surrounding properties because the amount of open space would be reduced.

Crook testified that in October 1987 the Sumichrasts petitioned to subdivide their property, lot 2, into two lots. Crook prepared a report and recommendation regarding the subdivision for the city's planning commission. Crook stated that he recommended approval of the subdivision because it conformed with R-2 zoning regulations, *i.e.*, each lot would measure more than 20,000 square feet. The witness also recommended that the northern half of the back portion of Briar Lane (east of Beverly Place) be vacated and made part of the rear lot in the Sumichrasts' subdivision. The Sumichrasts' original plan for subdivision, plan A, did not include this vacation. The planning commission and the city council adopted Crook's recommendation, plan B, and passed an ordinance to that effect. At the same time, the city council adopted an ordinance vacating the southern half of the back portion of Briar Lane to lot 3, the Carpenders' lot. The city sold the vacated portions of Briar Lane to the lot owners, charging $1,000 for each portion. The Sumichrasts and Carpenders later paved the portions of Briar Lane sold to them, making it into a street with a cul-de-sac at the end.

Crook explained the reasons why he had preferred plan B over plan A for subdivision of the Sumichrasts' property. Crook said that plan B created a larger lot and, therefore, a larger buildable area which in turn minimized further subdivision in the area and ensured that an area of open space would be preserved. Crook related that in vacating a portion of Briar Lane the city was following its policy of vacating rights-of-way for which no need existed.

Subsequent to Crook's recommendation that plan B be adopted, the city manager wrote a letter to homeowners on the east side of Beverly Place informing them that the city had no plans to improve the Western Avenue right-of-way behind their property. The city offered to vacate the 80-foot width of the Western Avenue right-of-way behind each owner's rear lot line if the owner was willing to enter into a permanent covenant running with the land, providing that the right-of-way remain as open space. Eighteen owners, including the Sumichrasts and Carpenders, took advantage of the city's offer.

Crook testified that the lot-in-depth subdivision requirements of the city's zoning ordinance would apply to the subdivision of plaintiffs' property. Crook defined a lot-in-depth as "a lot that does not have full frontage on a public street." The city required all such lots to have a greater width than a standard lot, *i.e.*, 150 feet as opposed to the 100-foot width of plaintiffs' lot. Crook related that the planning reasons for such lots were to maintain appropriate open space or separation between adjacent property, allowing for no encroachment, to maintain buildable areas and widths comparable to those of standard lots, and to have a minimum impact on surrounding properties. Crook stated that subdivision of plaintiffs' property would be contrary to the whole premise of the lot-in-depth requirements in that it would not preserve open space, would have an adverse impact on adjacent properties, and would have a definite, precedential impact on the whole area.

Crook opined that there is a community need to preserve open space and that the 20,000-square-foot zoning requirement, the lot-in-depth requirements, and the vacation of rights-of-way tend to preserve open space from a planning standpoint. Crook defined open space as "an area of land that is retained in perpetuity without alteration from the standpoint of construction of any type" and "it is not necessarily contingent at all upon public access."

Neil King, a real estate broker and appraiser, testified that he was familiar with the subject property and the area surrounding it. According to King, plaintiffs' property was consistent with the present R-2 single-family residence zoning requiring a minimum lot

size of 20,000 square feet. King opined that no community need existed for dividing plaintiffs' property into two lots, as the trend in the city during the past several years had been for larger rather than smaller homesites.

It was King's opinion that dividing plaintiffs' lot into two pieces would have an adverse effect on the area. As the 20 lots to the south of plaintiffs' property were similarly situated on their lots, plaintiffs' subdivision, according to King, would set a precedent for these other properties thereby decreasing the amount of open space in the area. King opined that a need existed to preserve open space, that the city had taken extraordinary steps to preserve open space, and that the 20,000-square-foot zoning requirement tended to preserve it.

In King's opinion the fair-market value of plaintiffs' property, as presently configured, was $400,000. King based his opinion on recent sales of houses in the subdivision and present offerings as well as on his experience in appraising houses in plaintiffs' subdivision. If plaintiffs' property was divided into two lots, King stated that the front lot would be valued at $385,000 and the back lot, after improvements, would be worth approximately $125,000. King estimated that it would cost $84,000 to make the back lot buildable so that the real value of this lot would be $41,000. That meant, according to King, that the total value of the front and back lots would equal about $425,000, whereas the property as it presently existed equaled $400,000.

King stated that he was aware that the Sumichrasts' and Carpenders' rear lots were being offered for $275,000. The difference between the value of their rear lots and the value of plaintiffs' back lot, as estimated by King, resulted from the fact that their lots were larger than 20,000 square feet and had substantial frontage on Briar Lane. King explained that if plaintiffs' property had conventional street access along Briar Lane to Western Avenue, its value would probably be the same as that of the Sumichrasts' and Carpenders' lots.

King believed that plaintiffs' property would be unaffected by houses being built on the rear lots of the Sumichrasts' and the Carpenders' property, as the houses would be around the corner from plaintiffs' house and scarcely visible. According to King, the highest and best use of the Carpenders' property was for it to be subdivided, thereby capitalizing on the new street, whereas the best and highest use of plaintiffs' property was one house on one lot. King stated that even if the city had not vacated Briar Lane, the subdivision of the Sumichrasts' and Carpenders' lots would still have been in full compliance with zoning requirements.

Thompson Dyke, a private planning and zoning consultant of 34 years, was the principal consultant in the city's preparation of its 1978 comprehensive plan. According to Dyke, the city represented one of the most diligent communities with which he had ever worked in the development of its comprehensive planning. Moreover, the city had taken very careful steps over the decades to update and improve upon its planning procedures. Dyke stated that he was familiar with plaintiffs' property and the surrounding area. Dyke described the area as a "very attractive single family residential neighborhood approximately thirty years old" that "provides privacy, open space, and an attractive living environment" and is developed.

Dyke opined that the highest and best use of plaintiffs' property was for one, single-family, residential home because the entire neighborhood was subdivided in a similar manner. Dyke related that the subdivision developer created deeper lots on plaintiffs' side of Beverly Place, the east side, to act as a buffer zone to the railway tracks upon which the lots backed. Although the Carpenders' lot also had railway tracks at the end of the lot, Dyke explained that it differed from plaintiffs' lot because it was larger than 40,000 square feet and, therefore, could be subdivided into two lots of more than 20,000 square feet each. According to Dyke, a 20,000-square-foot lot provided sufficient space for front, side, and rear yards, for setbacks, and for outdoor enjoyment of the property.

Dyke stated that subdivision of plaintiffs' lot would have a deleterious effect on surrounding property because it would establish a planning precedent for the 20 lots to the south of plaintiffs' property, permitting those owners also to subdivide their property. In effect, the number of houses and families would double in that area, thereby changing the plan for the development of the area as it presently exists and reducing the open space in the area.

Dyke testified that he was familiar with the lot-in-depth subdivision requirements of the zoning ordinance and that they were reasonable as applied to plaintiffs' lot. According to Dyke, a lot-in-depth characteristically has a narrow frontage on a street and a large rear area. Dyke agreed that the city's lot-in-depth requirements demanded that a lot be 150 feet rather than 100 feet wide with wider setbacks of 40 feet all around the property. The witness explained that the planning reason for the greater width and setbacks was to prevent a house on such a lot from bordering upon the rear yards of surrounding properties.

Dyke opined that a community need existed to preserve open space, i.e., to establish areas of public and private open space so that

the community continued to be an attractive place to live. In Dyke's opinion, the city's 20,000-square-foot zoning requirement, the lot-in-depth zoning requirement, and the city's vacation of parts of Briar Lane and the Western Avenue right-of-way tended to preserve open space. Dyke agreed that the subdivision of the Sumichrasts' and Carpenders' lots reduced the open space in the area but stated that both lots measured more than 40,000 square feet in area, complied with the city's zoning ordinance, and would not deleteriously affect the area like subdivision of the plaintiffs' property would do. Dyke stated that even if the city had not vacated portions of Briar Lane to the Sumichrasts' and the Carpenders', their lots still measured larger than 40,000 square feet.

James Leech, a real estate appraiser and broker since 1973, testified that he was familiar with plaintiffs' property and the surrounding area, having done appraisal work in the Whispering Oaks subdivision throughout the years. In Leech's opinion, plaintiffs' present use of their property was consistent with the zoning and character of the surrounding area, which had been developed in similar fashion on similar lots with similar market values. Leech opined that dividing plaintiffs' property would negatively affect surrounding properties because subdivision would not be in character with the other lots in the neighborhood, would add to the density of the area, and would reduce open space. Leech also believed that subdivision of plaintiffs' property would establish a precedent because other similar lots would want to subdivide. According to Leech, no community need existed for subdivision of plaintiffs' property because no high demand for new homesites existed in the area. Rather, in the witness' opinion, a community need existed to preserve open space because of the character of the neighborhood, the manner in which the city developed, and the maintenance of the integrity of R-2 zoning.

Leech valued plaintiffs' property as it presently existed at $425,000. If divided into two lots, Leech opined the fair-market value of the front parcel would be $375,000 and the back lot, if improved, would be $150,000. Preparing the site for building and running sewer, water, and a road to it would cost about $84,000. Subtracting the cost of these improvements from the $150,000 figure, left a net value of $66,000 for the rear lot. According to Leech, the total value of plaintiffs' property, as subdivided, would be $441,000, or $16,000 more than its present value.

Leech opined that demand for, or marketability of, the rear lot would not be great because of its size and the fact that the property lies adjacent to the railway tracks. Leech stated that the city's vaca-

tion of portions of Briar Lane and the Western Avenue right-of-way precluded access to the rear half of plaintiffs' lot. To provide access, according to Leech, plaintiffs would have to construct a driveway from Beverly Place down the side of their lot. The zoning ordinance prevented this because plaintiffs' lot was not 150 feet wide as required for a lot-in-depth subdivision of property.

Leech believed the highest and best use of the Carpenders' lot was as subdivided for two houses because the lot, not including the vacated portion of Briar Lane, measured approximately 7,000 square feet larger than plaintiffs'. Also, the fact that a house on the Carpenders' rear lot could be constructed on a cul-de-sac made it a more functional homesite than a home constructed at the rear of plaintiffs' property. Leech did not think the subdivision of the Carpenders' lot negatively impacted plaintiffs' property because the subdivision met the R-2 zoning requirements and the house, when built, would face on the Briar Lane cul-de-sac. Additionally, the fact that the city vacated a portion of Briar Lane would not affect the value of plaintiffs' property because it was an interior lot. Likewise, Leech stated, plaintiffs would not be affected by the city's vacation of certain portions of Western Avenue because those portions of the right-of-way had never been improved, and no plans existed to do so.

The trial court entered its judgment.

On appeal, plaintiffs contend that the trial court erred in finding that plaintiffs could not subdivide their lot because (1) the city abandoned Western Avenue adjacent to plaintiffs' lot; (2) Whispering Oaks constitutes a common-law subdivision; and (3) the lot-in-depth subdivision requirements and the 20,000-square-foot minimum lot size requirement of the zoning ordinance are unconstitutional as applied to plaintiffs' lot.

We first address plaintiffs' arguments regarding the constitutionality of the city's zoning ordinance and, in particular, those sections pertaining to the 20,000-square-foot minimum lot size and the lot-in-depth requirements as they apply to plaintiffs' property.

■ Plaintiffs assert, first of all, that the trial court utilized the incorrect legal standard, *i.e.*, the standard for granting a variance of the zoning ordinance rather than the standard for determining the constitutionality of the ordinance, in determining the validity of the zoning ordinance. Plaintiffs base their claim on the fact that the trial court made several references to variances. We, however, do not believe that those references show that the trial court employed an improper legal standard in reaching its determination that the zoning ordinance was not unconstitutional as applied to plaintiffs' property. In

fact, as plaintiffs acknowledge here, the court correctly stated in its written judgment that the test for determining the unconstitutionality of the ordinance was whether it was "arbitrary and unreasonable" and had "no substantial relation to the public health, safety or welfare."

Plaintiffs argue that the trial court's finding that the zoning ordinance is reasonable as applied to their property is against the manifest weight of the evidence. A zoning ordinance may be valid in general but invalid as to a particular piece of property (*Glenview State Bank v. Village of Deerfield* (1991), 213 Ill. App. 3d 747, 759). Zoning ordinances carry a presumption of validity, and the party challenging the presumption has the burden of establishing by clear and convincing evidence that, with respect to his property, the ordinance is arbitrary, capricious, and unreasonable and bears no substantial relation to the public health, safety or general welfare. *St. Lucas Association v. City of Chicago* (1991), 212 Ill. App. 3d 817, 822.

Eight factors should be taken into consideration in determining the validity of a zoning ordinance: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished; (3) the extent to which the destruction of property value of the plaintiff promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as opposed to the hardship imposed upon the individual property owner; (5) the suitability of the subject for the zoned purposes; (6) the length of time the property has been vacant as zoned considered in the context of land development in the area; (7) the care with which a community has undertaken to plan its land-use development; and (8) the evidence, or lack of evidence, of community need for the use proposed by the plaintiff. (*New Lenox State Bank v. County of Will* (1990), 205 Ill. App. 3d 457, 465.) " '[N]o one factor is controlling.' " 205 Ill. App. 3d at 465, quoting *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 47.

■ Courts recognize the first factor, the existing uses and zoning of nearby property, as being of paramount importance. (*St. Lucas Association*, 212 Ill. App. 3d at 823.) The evidence at trial showed that plaintiffs' lot constituted one lot of 485 lots spread over an area of 341 acres and consisting of similarly zoned, R-2 single-family residences on 20,000-square-foot lots, and similarly used property. Plaintiffs' lot and the other lots in the area had been zoned and used in the same manner for over 35 years. Plaintiffs testified that they knew of the R-2 zoning and relied on it in deciding to purchase the property.

Nevertheless, plaintiffs offer several arguments to demonstrate that the uses and the zoning of nearby property favor their subdivi-

sion of their property and that the current zoning classification, requiring lots to be at least 20,000 square feet in size, is unreasonable as applied to their property. First, plaintiffs contend that their lot is comparable to lots 1, 2 and 3 and that comparing their lot to the 20 lots south of them is deceptive. Plaintiffs point out that lots 1 to 4 are adjacent to the Chicago and North Western Railway tracks and fronting on Beverly Place, are built on the front half of the lots with the rear half left wooded, and are significantly larger than all the other lots in unit 2 of the Whispering Oaks subdivision. Since lots 1, 2 and 3 have been allowed to subdivide their property into two buildable lots, plaintiffs assert that they, too, should have been allowed to divide their property in half.

However, lots 1, 2 and 3 are considerably larger than plaintiffs' lot, each measuring more than 40,000 square feet. Plaintiffs' lot measures 37,760 square feet and, therefore, cannot be divided into two lots of 20,000 square feet each as can lots 1, 2 and 3. Moreover, although lots 1 through 4 are larger than other lots in unit 2 of Whispering Oaks, plaintiffs' lot is nearly identical in size, deviating only slightly in depth, and in shape as 20 lots lying to the south and comprising part of units 3 and 4 of Whispering Oaks. All of these lots, like lots 1 through 4, lie adjacent to the railway tracks and are occupied by only one house. Permitting plaintiffs to subdivide their lot would, according to the testimony of all of the city's experts, set a precedent for these other lots. Even plaintiffs' expert, Norman Drummond, admitted that these lots should be treated similarly to plaintiffs' property if plaintiffs are allowed to subdivide. However, such a result would be inconsistent with the planning and zoning of the area.

Additionally, plaintiffs contend that the current zoning of the area is unreasonable as applied to their property because, as testified by their expert, Drummond, plaintiffs' lot possessed a larger buildable area than the Carpenders' lot. Yet, the Carpenders were permitted to subdivide their lot. We agree, however, with the city that the amount of buildable area is immaterial in interpreting the ordinance. The ordinance refers to total lot size and not the size of the buildable areas. In terms of lot size, plaintiffs' lot if subdivided in half would result in two lots measuring 18,880 square feet each, less than the required 20,000-square-foot minimum for the R-2 zoning of the area.

■ Plaintiffs also claim that the lot-in-depth requirements of the zoning ordinance have been unfairly applied to them because the Sumichrasts' lot, lot 2, and the Carpenders' lot, lot 3, were essentially lots-in-depth and not subdividable, like plaintiffs' lot, until the city al-

lowed Briar Lane to be improved. Prior to the city's action, the widths of the Sumichrasts' and the Carpenders' lots, 130 feet and 117 feet respectively, measured less than the 150 feet required for lots-in-depth in the R-2 zone. Plaintiffs ignore the simple fact, however, that both of these lots fronted on two streets, Beverly Place and Briar Lane, and, therefore, did not constitute lots-in-depth. That Briar Lane was not improved prior to the city's action is inconsequential because Briar Lane was a dedicated street.

Plaintiffs' expert, Norman Drummond, opined that the lot-in-depth subdivision requirements were unreasonable as applied to plaintiffs' property because the physical nature of the property, *i.e.*, its wooded state, and its excessive depth made it suitable for the addition of a house on the rear portion. Conversely, the city's four expert witnesses testified that the requirements were reasonable as applied to plaintiffs' property and promoted the goals of the zoning ordinance. Those goals were substantially the same as those of the 1955 zoning ordinance which plaintiffs testified they reviewed before purchasing their property. Among the goals to be realized through the city's zoning ordinance were the "preservation of the present character of the City" to the end that "adequate light" and "pure air" were secured in the promotion of the "public health, safety, comfort, morals and welfare of the citizens" of the city.

Charles Crook, director of planning and development for the city, stated that the purpose of the lot-in-depth requirements of the zoning code was to maintain appropriate open space or separation between adjacent properties, allowing for no encroachment and causing minimum impact on surrounding properties. Subdividing plaintiffs' property would, according to Crook, defeat the whole premise of the lot-in-depth subdivision requirements because it would not preserve open space, would have a negative impact on adjacent properties, and would have a definite, precedential effect on the whole area.

Both Neil King and James Leech, real estate brokers and appraisers familiar with plaintiffs' property and the surrounding area, found the lot-in-depth requirements were reasonable because those requirements preserved open space. King stated that by reason of its setbacks and frontage requirements a lot-in-depth subdivision preserved the appearance of open space while allowing two homesites to be constructed on a large enough lot. Thompson Dyke, a private planning and zoning consultant, testified that the planning reason for the greater width and setbacks required by a lot-in-depth subdivision was to prevent a house on such a lot from bordering upon the rear yards

of surrounding properties and that such a subdivision preserved private as well as public open space.

Plaintiffs' showing that the lot-in-depth subdivision requirements of the city's zoning ordinance were invalid consisted primarily of testimony by their expert, Norman Drummond. His testimony regarding the reasonableness of the lot-in-depth requirements as applied to plaintiffs' property, however, was in direct conflict with the testimony of the city's four experts and did not prove that the requirements were unreasonable or arbitrary.

The second factor we are to consider is the extent to which property values are diminished by the particular zoning restrictions. This factor requires the court to consider the difference between the value of the property as presently zoned and the value it would have if zoned to allow the proposed use. *St. Lucas Association*, 212 Ill. App. 3d at 825.

The city's expert witnesses testified as to the difference between the present value of plaintiffs' property and its value if plaintiffs were permitted to subdivide. Neil King, a real estate broker and appraiser familiar with recent sales of houses in the subdivision and present offerings, valued plaintiffs' property, as presently configured, at $400,000. King stated that if the property could be subdivided into two lots, the value of the front lot with the house would be $385,000 and the back lot after improvements would be $125,000. King estimated the cost of improvements, *i.e.*, bringing in sewer, water, and a road, at $84,000. After deducting this amount from $125,000, the real value of the back lot would be $41,000. Thus, the total net value of the front and back lots amounted to $385,000 plus the $41,000, or $426,000, just $26,000 more than its present value of $400,000, undivided.

James Leech, a real estate broker and appraiser who had done appraisal work in the Whispering Oaks subdivision for many years and was familiar with plaintiffs' property and the surrounding area, valued plaintiffs' property, as it presently existed, at $425,000. Leech opined that if the property was divided into two lots, the fair-market value of the front parcel would be $375,000 and the back lot, if improved, would be $150,000. Deducting the estimated $84,000 for improvements to the back lot from the $150,000 left a net value of $66,000 for the back lot. Thus, the total value of plaintiffs' property as subdivided would, in Leech's opinion, amount to $375,000 plus $66,000, or $441,000, just $16,000 more than its present value of $425,000.

■ Diminution in value is not alone a sufficient reason to invalidate a more restrictive zoning classification than the one proposed, and this is particularly true where, as here, plaintiffs purchased their property with full knowledge of the zoning restrictions. (*American National Bank & Trust Co. v. Village of Oak Lawn* (1979), 81 Ill. App. 3d 952, 960.) King's and Leech's testimony showed that any diminution in the value of plaintiffs' property resulting under the existing zoning did not sufficiently justify, as the city points out, changing the neighborhood and setting a planning and zoning precedent for the similarly sized and configured lots to the south of plaintiffs' property.

The third and fourth factors are frequently considered together and require a court to consider the hardship the zoning restrictions imposed on an owner in light of the extent to which the existing zoning promotes the general health, safety and welfare of the public. (*St. Lucas Association*, 212 Ill. App. 3d at 827.) By comparing these two factors a court can determine whether the relative gain to the public outweighs any hardship imposed on the owner. 212 Ill. App. 3d at 827.

■ Allowing plaintiffs to subdivide their property would, as the testimony and exhibits revealed, establish a precedent because the 20 lots to the south would have to be treated similarly and also allowed to be subdivided. This increased density would effectively alter an area which is basically wooded and, as described by Thompson Dyke, a private planning and zoning consultant, "provides privacy, open space and an attractive living environment."

Plaintiffs downplay the importance of maintaining open space, both public and private. But, as the city points out, open space has a value of its own and constitutes one of the principal bases for zoning. Plaintiffs' expert, Norman Drummond, testified that the whole community would not benefit from plaintiffs' extra deep, wooded lot and, therefore, the open space was not useable as open space. All of the city's experts, however, believed the community did benefit from the open space provided by plaintiffs' lot and the surrounding property. Charles Crook, director of planning and development for the city, testified that subdivision of plaintiffs' property would have a deleterious effect on surrounding properties because the amount of open space would be reduced. Neil King stated that plaintiffs' subdivision would establish a precedent for other properties to the south, decreasing the amount of open space in the entire area. Thompson Dyke opined that a community need existed to establish areas of public and private open space so that the community continued to be an attractive place

to live. According to Dyke, plaintiffs' subdivision would have the effect of establishing a planning precedent which would, in turn, double the number of houses and families in the area thereby reducing the open space. James Leech testified that plaintiffs' subdivision would have a negative effect on surrounding properties, adding to the density of the area by placing one house behind another on plaintiffs' lot and the lots to the south and reducing open space.

The testimony of three of plaintiffs' neighbors, Abigail Fassnacht, Marilyn Wildman, and Lee Schwartz, demonstrated that they relied on the character of the neighborhood and the manner in which it was zoned, as it presently exists and existed in the past, in purchasing their lots. All three witnesses testified that they opposed plaintiffs' subdivision of their lot. Two of the witnesses, Fassnacht and Schwartz, expressed concern that plaintiffs' subdivision would reduce the value of their property. Schwartz, who purchased his property in 1989, testified that he had selected the area because it was an established neighborhood and, therefore, he would not have to be concerned about any building occurring in the neighborhood. One neighbor, Robert Gauthier, testified in favor of plaintiffs' subdivision. However, he lived directly to the south on a lot identical in size and shape to plaintiffs' lot and would, therefore, be able to subdivide his property if plaintiffs were allowed to subdivide theirs.

■■ Plaintiffs next contend that their subdivision would benefit the public by increasing tax revenues. This theory was scarcely presented to the trial court. The only mention of taxes on plaintiffs' part occurred when plaintiff, Mr. Hamann, stated that building a house on his rear lot would result in more property on the tax rolls that the city could tax. The only other mention was testimony by James Leech acknowledging, under cross-examination, that if another house could be added to plaintiffs' property the assessed valuation of the property would increase. Nevertheless, permitting plaintiffs to subdivide based strictly on the fact that tax revenues would increase would set an undesirable precedent, resulting in more houses, more lots, more residents, and more congestion in order to broaden the assessed valuation base. Such a means to an end would have a deleterious effect on the general health, safety and welfare of the public.

We conclude that with the exception of the testimony of plaintiffs' expert, Norman Drummond, the other testimony demonstrated that the present zoning of plaintiffs' property and other lots in the area promoted the general health, safety and welfare of the public and that the public gain of keeping the area as presently zoned outweighed any hardship imposed on the plaintiffs by the existing zoning.

The fifth factor we consider is the suitability of the property for the zoned purposes. Plaintiffs' expert, Norman Drummond, testified that the highest and best use of plaintiffs' property was for two, single-family dwellings because plaintiffs' lot, as it presently existed, was much larger than it needed to be and was underdeveloped.

However, three of the city's experts, Neil King, Thompson Dyke, and James Leech, opined that plaintiffs' property was suitable for its presently zoned purpose. King stated that the highest and best use of plaintiffs' property was its continued use as a single-family residence because the use conformed with that of neighboring properties, *i.e.,* one homesite on a lot approximately 100 square feet wide by 377 square feet deep. Conversely, the Carpenders' property was suitable for two houses because its configuration was substantially different, *i.e.,* larger, and the rear lot would have a lot of frontage on a conventional street (Briar Lane cul-de-sac). Dyke testified that the highest and best use of plaintiffs' property was for a single-family residence because the entire neighborhood was one of single-family homes. Leech opined that the size of the subject property and the character of the surrounding area made it suitable for its presently zoned purpose.

■ We believe the property in question appears to be well-suited for its use, as the property has been used as zoned, *i.e.,* for a single-family residence on a lot not smaller than 20,000 square feet, for more than 35 years. The fact that the lot is substantially larger than the minimum lot size for a R-2 zoned district does not make it unsuitable for its own purpose. Thompson Dyke, a planning and zoning consultant for 34 years, stated that plaintiffs' lot and the other lots on the east side of Beverly Place were created with a greater depth than lots to the west to act as a buffer to the railway tracks behind the property. We conclude that the use of plaintiffs' property is consistent with the current zoning and is not incompatible with the uses and zoning of surrounding property. Allowing plaintiffs to subdivide their property into two lots of only 18,800 square feet each would, we believe, have a contrary effect.

■ The sixth factor to be considered is the length of time the property has been vacant. The city maintains that the rear half of plaintiffs' property has been part of their backyard for 35 years. Plaintiffs assert that the rear half has always been vacant for that period of time since it is wooded and undeveloped. "Backyard" is defined as "the portion of a lot or building site behind a house, structure or the like, sometimes fenced, walled, etc." (Random House Dictionary of the English Language 109 (1983).) In light of this

definition, we do not agree with plaintiffs that the rear half of their lot is not part of their backyard. It is that portion of their lot behind their house, and the fact that it is undeveloped and wooded appears irrelevant in considering whether it can be considered part of their backyard. We note, parenthetically, that plaintiffs' own expert, Norman Drummond, referred to the back half of plaintiffs' lot as their "backyard."

The term "vacant" in reference to land means "[a]bsolutely free, unclaimed, and unoccupied" and "implies entire abandonment." (Black's Law Dictionary 1388 (5th ed. 1979).) In this sense, "vacant" means that the land is open to any claimant. We doubt that plaintiffs would be willing to consider the back half of their lot as vacant if it meant that another could lay claim to it. Although consideration of this sixth factor may be a matter of semantics, as plaintiffs claim, we believe it weighs in the city's favor.

■ The seventh factor to be considered is the care with which the community has undertaken to plan its land-use development. Plaintiffs presented little evidence on this issue. The only testimony plaintiffs presented in this regard was their own. Lila Hamann expressed her belief that the city was not careful in planning for the use of Whispering Oaks because Beverly Place was supposed to be a quiet residential street and Western Avenue was to be a thoroughfare. However, Western Avenue was never developed behind plaintiffs' property. As a result, Beverly Place received more traffic than anticipated, according to Mrs. Hamann, and she had to petition the city a few years ago to place stop signs on Beverly Place to slow down traffic. However, we find this testimony does not necessarily reflect poor planning.

Similarly, Walter Hamann's only example of poor planning in the Whispering Oaks subdivision was the city's decision not to develop Western Avenue which, Hamann maintained, the official plan designated as a proposed cross-town route. Conversely, Charles Crook, director of planning and development for the city, testified that on the 1955 comprehensive plan, which was the one Mr. Hamann stated he reviewed before purchasing his property, Western Avenue behind plaintiffs' lot was not shown as a proposed major street.

The city's evidence revealed careful planning on its part. Charles Crook stated that the city had had a comprehensive plan since 1929 and that the primary goal of the plan was to ensure the orderly and planned development of the community. Crook testified that plaintiffs' property was in compliance with the city's comprehensive plan and that its zoning was also consistent with the plan. Crook related that

the area where plaintiffs' property was located had been zoned R-2 since the beginning of the city's zoning history in 1923 and that the area's development was consistent with the overall zoning plan.

The city's expert, Thompson Dyke, lauded the care with which the city had undertaken to plan its land development. Dyke, the principal consultant for the city's 1978 comprehensive plan, stated that in the realm of comprehensive planning the city was one of the most careful communities with which he had ever worked and that the city had taken careful steps over the decades to update and improve upon the planning procedures. This was illustrated by the fact that the city's 1929 comprehensive plan was appraised and revised in 1955 to meet, according to the introduction to the plan, "changing conditions and new problems" and to meet "probable future needs." The plan was again revised in 1978, "to manage and control future growth and development" in order that the plan was "in harmony with the developed and natural character of the City and to set forth needed public facilities and resources to accommodate the future population." The 1978 plan was amended in 1981, 1986, 1988, and 1989. In 1986, for example, the city, according to Dyke, looked at the street plan and updated it.

Based on the evidence presented by both sides, we find the seventh factor weighed heavily in the city's favor.

The eighth and last factor to be considered is the evidence of community need for the use proposed by plaintiffs. Both Walter Hamann and his expert, Norman Drummond, opined that the community needed more buildable lots of about 20,000 square feet in size and that the only buildable ones remaining in the Whispering Oaks subdivision were those on the Sumichrasts' and Carpenders' property.

Conversely, the city's experts believed that no need existed to divide plaintiffs' property into two lots. Neil King, who as an appraiser was familiar with Whispering Oaks and other areas in the city, stated that the demand in the city during the past several years had been for larger, rather than smaller, homesites, averaging 1½ acres in most subdivisions. James Leech, who also had appraised property in Whispering Oaks and in the city, opined that no demand existed in plaintiffs' area for new homesites. The fact that a new house was being constructed one-half mile away from plaintiffs' property did not, in Leech's opinion, demonstrate a community need for subdivision of plaintiffs' property but rather indicated only that a good housing market existed in the city. Thompson Dyke stated that as a result of a study he conducted in 1977 for the city, he determined that 23% of all the lots in the city were 20,000 square feet or smaller. According to

Dyke, no need existed for smaller lots. Rather, the trend of development for single-family residences in the city in recent years had been, Dyke stated, towards larger, rather than smaller, lots of one acre to 1½ acres.

● ■ We conclude that plaintiffs' evidence failed to prove a great need for lots of the size of plaintiffs' east half. Most of the evidence indicated that the need was for much larger lots, and plaintiffs' lot, as one of the larger lots in the Whispering Oaks subdivision, would appear to be in greater demand as presently configured than as subdivided.

● ■ From our review of the aforementioned factors, we find that plaintiffs failed to prove by clear and convincing evidence that with respect to their property the zoning was arbitrary, capricious, and unreasonable. Accordingly, the trial court's determination that the zoning ordinance was not unconstitutional as applied to their property was correct.

● ■ Our finding makes it unnecessary to consider plaintiffs' arguments that their lot is greater than 40,000 square feet because: (1) the city abandoned the Western Avenue right-of-way and, therefore, the portion behind their property becomes part of their lot; (2) unit 2 of Whispering Oaks is a common-law subdivision and, therefore, plaintiffs' property includes all of the Western Avenue right-of-way and half of Beverly Place; and (3) plaintiffs' easement in Western Avenue becomes part of plaintiffs' total lot area. Section 46—2(B) (53.1) of article II of the city's zoning ordinance defines minimum lot area as that "area of a lot in any zoning district, exclusive of the area of any street, road, private road, or access area or access easement on or across such lot." (Lake Forest, Ill., Zoning Ordinance §46—2(B) (1989).) Under this definition, no street or easement can be included in computing lot area, and, therefore, Western Avenue cannot, under any of plaintiffs' theories, be considered part of plaintiffs' lot. Consequently, plaintiffs' property measures 37,760 square feet and cannot, under the city's zoning ordinance, which we have found valid, be subdivided into two lots.

● ■ Next, plaintiffs contend that the trial court erred in finding that the validity of the lot-in-depth subdivision requirements of the zoning ordinance is moot. The court found that because plaintiffs had access to the rear half of their lot by way of their easements in Briar Lane and Western Avenue, the issue concerning the constitutionality or validity of the lot-in-depth requirements was moot. Plaintiffs maintain the issue is not moot because access to the use of their lot by means of a private driveway from Beverly Place may be more eco-

nomical than constructing a road connecting the cul-de-sac at the end of Briar Lane to Western Avenue and from Western to plaintiffs' rear lot. We, however, need not address this contention.

It was plaintiffs' position in the trial court that the lot-in-depth subdivision requirements did not exist at the time they purchased their lot and that they were unconstitutional in that they arbitrarily and unreasonably prevented plaintiffs from subdividing their lot into two lots. The zoning ordinance's lot-in-depth requirements permit the division of one lot into two if each lot measures 23,000 square feet and has a minimum lot width of 150 feet. Plaintiffs' lot, at 100 feet wide, falls far short of the width requirement. Additionally, the total square footage of plaintiffs' lot, at 37,760 square feet, clearly does not allow for the division of the property into two lots of 23,000 square feet or even two lots of 20,000 square feet, the minimum lot size for residences in plaintiffs' area since the time of plaintiffs' purchase. As plaintiffs' lot does not satisfy the zoning ordinance's requirements for a lot-in-depth subdivision and as we have determined that the ordinance is valid as applied to plaintiffs' property, any discussion of the validity of such subdivision would be purposeless.

● ■ Finally, we address the city's cross-appeal that plaintiffs do not possess private easement rights in the portions of Briar Lane and Western Avenue which the city vacated. Plaintiffs argue that the city has no standing to appeal the court's finding regarding plaintiffs' easement rights in the vacated streets. Plaintiffs posit that the city relinquished all rights in the vacated portions of Briar Lane and the Western Avenue right-of-way when it enacted the ordinances incorporating the vacations into the adjoining properties belonging to the Sumichrasts and Carpenders. Therefore, plaintiffs assert, only the Sumichrasts and the Carpenders had standing to appeal the issue of easement rights, and since they filed no notice of appeal, this issue is not properly before the court. We do not agree.

Any party to a case may seek appellate review from a final judgment which is adverse to his interests, and whether the party was actually aggrieved does not determine his right to appeal. (*St. Mary of Nazareth Hospital v. Kuczaj* (1988), 174 Ill. App. 3d 268, 270-71.) Here, the city has an interest in the easement issue because it vacated portions of Briar Lane and the Western Avenue right-of-way to prevent further subdivision and to preserve open space. As one of the arguments in support of their position that they should be allowed to subdivide their property into two lots, plaintiffs maintain that they had access to the rear half of their lot via the easement rights in the vacated streets. Thus, the trial court's ruling that plaintiffs possess

such street easement rights is adverse to the city's interests in the subject matter of this controversy, and, therefore, the city's cross-appeal is properly before this court.

Subsequent to the Sumichrasts' request for subdividing their property into two lots, the city vacated by ordinance the easterly 113 feet of Briar Lane and portions of the Western Avenue right-of-way east of the Sumichrasts' and Carpenders' property. The northern half of the vacated portion of Briar Lane became part of the Sumichrasts' adjoining property and the southern half became part of the Carpenders' adjoining property, thereby extending the parties' property lines to the Western Avenue right-of-way. Additionally, the city vacated to the Sumichrasts and Carpenders those portions of Western Avenue that abutted the rear portion of their lots.

Relying on both the restrictive covenants of the subdivision and the plat of subdivision incorporated therein, the trial court determined that the resubdivision of the Sumichrasts' and Carpenders' lots to include Briar Lane violated the restrictive covenants running with the land. According to those restrictions, all easements affecting any lot or part of a lot in the Whispering Oaks subdivision inured to the benefit of every lot, or part of a lot, until such time as a majority of the lot owners agreed to change such a restriction. As no change had ever occurred, plaintiffs retained easement rights in Briar Lane as well as in the Western Avenue right-of-way regardless of the city's vacation of the streets.

The city acknowledges that the law in Illinois has been that when a person purchases a lot in a subdivision in reliance upon the plat, he retains private easement rights in the streets which are not extinguished by a vacation of the street. The city asserts, however, that the law has changed and that the only easements which survive the abandonment of a public roadway are those reasonably necessary for means of ingress and egress. It is the city's position that since Beverly Place constituted plaintiffs' means of ingress and egress to their property, plaintiffs had no private easements in the vacated portions of Briar Lane and Western Avenue. The cases relied upon by the city in support of its position, *i.e.*, *Crain Enterprises, Inc. v. City of Mound City* (1989), 189 Ill. App. 3d 130, and *Rexroat v. Thorell* (1982), 89 Ill. 2d 221, are not on point.

As plaintiffs aptly point out, our supreme court long ago established that

> "[i]f the owner of land lays out and establishes a town, and makes and exhibits a plan of the town, with various plats of spare ground, such as streets, alleys, quays, etc., and sells the

lots with clear reference to that plan, the purchasers of the lots acquire, as appurtenant to their lots, every easement, privilege and advantage which the plan represents as belonging to them as a part of the town, or to their owners as citizens of the town. And the right thus passing to the purchasers is not the mere right that such purchaser may use these streets, or other public places, according to their appropriate purposes, but a right vesting in the purchasers, that all persons whatever, as their occasion may require or invite, may so use them; in other words, the sale and conveyance of lots in the town, and according to its plan, imply a grant or covenant to the purchasers, that the streets and other public places, indicated as such upon the plan, shall be forever open to the use of the public, free from all claim or interference of the proprietor inconsistent with such use." (*Zearing v. Raber* (1874), 74 Ill. 409, 412.)

The court reaffirmed this doctrine in *Wattles v. Village of McHenry* (1922), 305 Ill. 189, wherein the court stated:

"No law is better settled in this State than that which controls this case. Where the owner of land lays it out in lots and blocks and makes and exhibits a plat thereof showing streets and alleys and sells some of the lots with a clear reference to the plan, the purchaser acquires as appurtenant to the lots every easement, privilege and advantage which the plan represents as belonging to them as a part of the platted territory. *** The sale and conveyance of lots according to a published plat implies a grant or covenant to the purchaser that streets, alleys and other public places indicated as such upon the plat shall be forever open to the use of the public ***." 305 Ill. at 192.

This doctrine as to the private rights in platted streets as set forth in *Zearing* and *Wattles* and referred to in numerous other cases (see, *e.g., Gerstley v. Globe Wernicke Co.* (1930), 340 Ill. 270; *Trustees of Schools v. Dassow* (1926), 321 Ill. 346, 353; *Gridley v. Hopkins* (1877), 84 Ill. 528, 531; *Schwebl v. Seifer* (1991), 208 Ill. App. 3d 176, 181-82; *Cook v. Mighell Construction Co.* (1976), 40 Ill. App. 3d 1032, 1035) is that of the common law (*Bond v. Dunmire* (1984), 129 Ill. App. 3d 796, 811-12) and, thus far, has never been abandoned. Moreover, vacation of a street by a municipality does not extinguish the owners' rights derived from the plats of subdivision. *Cook*, 40 Ill. App. 3d at 1038.

The evidence showed that Briar Lane and Western Avenue were defined as streets on the plat of subdivision. Plaintiffs testified that

before purchasing their lot in unit 2 of the Whispering Oaks subdivision, they reviewed the plats of the subdivision, the comprehensive city plan, the zoning ordinance, and the building code and that they relied on these documents in deciding to purchase their lot. We conclude, therefore, that plaintiffs, as purchasers of a lot in the subdivision, relied on the implication conveyed by the subdivision's plat that the streets indicated on the plat would be forever open to their use. Moreover, the city presented no evidence to controvert this reliance.

We determine that the trial court's finding that plaintiffs retained their private easement rights in Briar Lane and Western Avenue, regardless of the city's vacation of portions of those rights-of-way, was proper.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and NICKELS, JJ., concur.