ROSEHILL CEMETERY COMPANY, Plaintiff-Appellee, *v.* THE CITY OF CHICAGO, Defendant-Appellant.—(Arcadia Terrace *et al.*, Intervening Defendants.)

First District (1st Division)   No. 82—198

Opinion filed April 18, 1983.

Stanley Garber, Corporation Counsel, of Chicago (Jerome A. Siegan and

Philip L. Bronstein, Assistant Corporation Counsel, of counsel), for appellant.

Robert Marks, of Marks, Marks and Kaplan, Ltd., of Chicago, for appellee.

JUSTICE McGLOON delivered the opinion of the court:

The city of Chicago appeals from a judgment declaring an amendatory zoning ordinance void. On appeal, the city contends the judgment is against the manifest weight of the evidence.

We affirm.

On November 7, 1980, plaintiff Rosehill Cemetery Company filed a declaratory judgment action against the city of Chicago challenging a zoning amendment which reclassified a portion of plaintiff's property from an R-4 multiple-family residential district to an R-1 single-family residence district. On June 11, 1981, Neighbors of Arcadia Terrace, a homeowners association consisting of persons living within 250 feet of the subject property, filed a petition for leave to intervene. The petition was granted, and the intervenors adopted the city's answer to the complaint.

Prior to trial, plaintiff, the city and the intervenors stipulated to the following evidence. Plaintiff operates a public cemetery consisting of 350 acres located in two separate parcels. Parcel A, the subject of litigation, consists of about 325 acres. It is bounded by Peterson Avenue on the north, the west line of the Chicago and Northwestern Railroad right-of-way on the east, and North Western Avenue on the west. The south side of the parcel is bounded by West Bryn Mawr Avenue, North Damen Avenue, North Bowmanville Avenue, and West Balmoral Avenue. Parcel B lies north of Peterson Avenue and consists of 25 acres. At all times since the adoption of the Chicago Zoning Ordinance of 1957 until the amendment in question was adopted, the property was zoned R-4. Among permitted uses under an R-4 classification are multifamily residences, apartment hotels, colleges and universities, housing for the elderly, and uses permitted under R-1 and R-3 classifications. R-1, R-3, and R-4 classifications permit cemetery operations.

The parties further stipulated that the alderman of the ward in which the cemetery is located introduced the zoning amendment. The amendment did not affect plaintiff's property lying north of Peterson Avenue or other neighboring properties. The proposed amendment was submitted to the department of planning, city and community development which recommended that the amendment not be adopted.

The ordinance was passed by the city council on September 24, 1980.

From January 1976 through and including December 1980, plaintiff sold 71,000 square feet of land for grave sites. The sale of graves totalled 7,511 square feet from January through July 31, 1981. On December 31, 1980, 2,728,191 square feet of the subject property remained unsold, and 1,091,421 square feet had been platted for grave sites. The parties stipulated that the platted property could be used for burial purposes only. The city stipulated that the remaining vacant, unplatted land, located in three separate sections of parcel A, could be sold and used for other purposes. The intervenors would not stipulate to this latter fact.

At trial, plaintiff's witness Robert Gillette, president, treasurer, and member of the board of directors of Rosehill, testified that 80-85% of the unplatted land fronted Western Avenue. Several three-story apartment buildings and a large car dealer lot are located on the north side of Peterson Avenue. South of parcel A is a city ward office and a large garage for garbage trucks. None of the surrounding property uses interferes with cemetery operations.

Based on the sale of burial plots in 1981, Gillette projected that it would take 76 years to sell the land already platted as individual grave sites and an additional 91 years to sell the unplatted section for such use. Using 1980 statistics, Gillette determined that the platted and unplatted land would be sold in 212 years. Based on his experience as an officer of Rosehill and his knowledge of various sociological factors, he believed that the future annual sale of grave sites would be no greater than the annual average of the past five years. Gillette further testified that the areas already platted of record for grave sites could not, under the company charter, be used for any other purpose. If the unplatted sections are used for other purposes, the cemetery property will be separated by the existing dense trees or new landscaping, if necessary.

Gillette further testified that Rosehill had entered into a contract with Jewel Tea Company whereby Jewel had an option to purchase 15.1 acres of the subject property fronting Western Avenue. The contract was contingent on Jewel's ability to obtain a planned development classification for the site. In August 1980, Jewel withdrew its request for the zoning classifiction from the city.

Rolf C. Campbell, a city planner and zoning consultant, described the uses and zoning of property surrounding the cemetery. He testified that property north of Peterson Avenue is used for commercial and multifamily residential purposes. A six- to eight-story senior citizens home is under construction near the northeast corner of the cem-

etery. Industrial uses predominate along the east and part of the south boundaries. The remainder of the southern boundary abuts the city's department of streets and sanitation facility, multifamily dwellings and commercial establishments. The west side of Western Avenue is used for commercial purposes and directly west of this are areas zoned R-4. The closest property zoned R-1 is about one-half mile west of the cemetery.

Campbell believed the highest and best use of the unplatted cemetery property would be a mixture of commercial and multifamily developments. He based his opinion on the following factors. Ninety percent of the unplatted land, or about 34 acres, is adjacent to Western Avenue which is an established business and commercial corridor. The cemetery property takes its character from and is an integral part of this area. Also, the trend of development is multifamily and commercial. An R-1 zoning for the cemetery property would have the following adverse effects: (1) the property would be rendered incompatible with surrounding uses; (2) the need for multifamily units in the area would be unsatisfied; (3) the city would realize a decrease in its tax base; and (4) Rosehill would be deprived of the full use, benefit and enjoyment of its property. R-4 developments would not interfere with the serenity of the cemetery because dense trees separate the subject property from the cemetery and additional landscaping barriers could be planned.

Plaintiff's witness Neil King, a real estate broker, appraiser and mortgage banker, confirmed Campbell's description of the subject property and surrounding areas. He testified that an R-1 use of the unplatted property would not be compatible with the commercial property along Western Avenue and newly constructed single-family homes would not be marketable because of the character of the area. The demand for multifamily units is greater than that for single-family residences. Neither the fair market value of neighboring property nor the public health, safety or welfare would be adversely affected by R-4 uses. In fact, an R-1 classification would diminish property values. In the event plaintiff elected to sell the 34 unplatted acres, the fair market value under an R-1 classification would be $850,000 and it would be unlikely that property zoned R-1 could be sold. Under an R-4 classification, the property would have a fair market value of $3,400,000.

William McCann, a real estate broker and appraiser, described the area surrounding the cemetery as a stable, established community consisting of dissimilar multifamily, business, and light and heavy industrial uses. R-1 uses would be incompatible and inconsistent with

existing uses and zoning of neighboring property. New homes built on the subject property would have to be sold for $100,000 to $150,000 each in order to make such a development economically feasible and no market exists in the area for homes in this price range. An R-1 classification would destroy the marketability of the property and cause it to remain undeveloped for 150 years. McCann further testified that there have been no changes in the area warranting a down-zoning to R-1 and that the highest and best use of the property would be multifamily and commercial developments.

Defense witness Patrick Arnold, an employee in the city's department of planning, testified that cemetery operations are permitted under both R-1 and R-4 zoning classifications. The areas surrounding the cemetery, although zoned R-4, are developed to a lesser density. Arnold also testified that streets, alleys, and railroad tracks are commonly used to delineate different zoning blocks.

John McNamara, a real estate broker called by the city as an expert witness, testified that uses permitted under the R-1 classification represented the highest and best use of the unplatted property. A single-family residential development would be economically feasible if the homes were sold for $125,000 each. Such homes would be marketable. The fair market value under an R-1 classification is $40,000 per acre. If zoned R-4, the property would have a higher fair market value, but McNamara could not specify a value.

McNamara acknowledged the accuracy of plaintiff's description of land uses surrounding the subject property. He also testified that no single-family dwellings had been built in the area since 1957 and that R-4 developments could be built on the unplatted cemetery property and still be buffered from the remainder of the cemetery property. McNamara agreed that the R-4 zoning had not and would not adversely affect neighboring property.

Alderman Ivan Rittenberg submitted the amendatory zoning ordinance. He testified that the purposes of the amendment were to make the zoning consistent with that of other cemeteries in the city, protect the pastoral nature and historic heritage of the cemetery, and reduce population density in the area. Competition with suburbs has led to a systematic down-zoning of property in the city. When questioned about ·a. newspaper article reporting that Rittenberg intended to re-zone the cemetery property to prevent construction of a shopping center, Rittenberg stated he had been misquoted.

The intervenors called Edward Collins, a student, as a witness. He testified that, using a technique learned in school, he had determined the age of some of the trees on the subject property to be 100

years old. The property is only one of two areas in the city which has vegetation native to Chicago 150 years ago. He further testified that the elevation of cemetery land is higher than that of the surrounding area.

Also called as witnesses by the intervenors were Martin Rosene, Dexter Ostegren, and Harris Rubin. Rosene, a real estate expert, testified that most cemeteries in Chicago are zoned R-2. Only Graceland Cemetery is zoned R-4. Ostegren and Rubin, residents of the area, gave testimony concerning flooding of homes near the subject property.

The trial court entered judgment in favor of plaintiff. The court found the amendatory ordinance was arbitrary, unreasonable, and capricious, bore no reasonable relationship to the public health, safety or welfare, and imposed an unconscionable hardship on plaintiff which was not justified by any public benefit. The court declared the amendatory ordinance void, enjoined the city from enforcing the R-1 classification, and held that the property could be developed under the R-4 classification.

The sole issue raised by the city on appeal is whether the trial court's judgment is against the manifest weight of the evidence.

■ A zoning ordinance is presumed to be valid and the party seeking to overcome the presumption must prove by clear and convincing evidence that the ordinance as applied to the subject property is arbitrary and unreasonable and bears no relation to the public health, safety or welfare. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65; *Heller v. City of Chicago* (1979), 69 Ill. App. 3d 815, 387 N.E.2d 745.) The factors to be considered in determining the validity of an amendatory zoning ordinance are the same as those involved in determining the validity of the initial zoning. (*Garner v. City of Carmi* (1963), 28 Ill. 2d 560, 192 N.E.2d 816.) These factors are:

(1) the existing uses and zoning of nearby property;

(2) the effect of the ordinance on property values;

(3) the promotion of the public welfare;

(4) the gain to the public as compared to the hardship imposed on the property owner; and

(5) the suitability of the property for the purpose zoned. (*Garner; Thompson v. Cook County Zoning Board of Appeals* (1981), 96 Ill. App. 3d 561, 421 N.E.2d 285.)

Of paramount importance is whether the subject property is zoned in conformity with surrounding, existing uses and whether those uses are uniform and established. (*Forestview Homeowners Association,*

*Inc. v. County of Cook* (1974), 18 Ill. App. 3d 230, 309 N.E.2d 763.) On appeal, the judgment of the trial court is entitled to great weight and should not be reversed unless it is against the manifest weight of the evidence. *Thompson.*

■■ Applying the aforementioned principles to the case at bar, we are compelled to affirm the judgment of the trial court. It is undisputed that the areas surrounding the subject property are zoned for commercial, multifamily residential, business, and industrial uses. No changes in the general character or existing uses occurred since 1957 and no single-family dwellings had been constructed. Thus, there is no public need or good which would justify the down-zoning to R-1. (*Cosmopolitan National Bank v. City of Chicago* (1963), 27 Ill. 2d 578, 190 N.E.2d 352.) Furthermore, plaintiff's witnesses testified and the city's expert agreed that the R-4 classification and development would have no adverse effect on the surrounding areas. If plaintiff were to sell the subject property zoned R-1, the property's value would be decreased by approximately $2,000,000. Also, the evidence indicates the property would be difficult to sell for such use because of the low demand for single-family residences in the area. It is obvious, therefore, that the gain to the public caused by the down-zoning is minimal when compared to the hardship imposed on plaintiff. We conclude that the plaintiff met its burden of proof and the trial court finding that the zoning amendment was arbitrary and unreasonable is not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.