STATE BANK OF COUNTRYSIDE, as Trustee, *et al.*, Plaintiffs-Appellants, v. THE CITY OF CHICAGO, Defendant-Appellee.

First District (2nd Division)   No. 1—96—2185

Opinion filed April 15, 1997.

TULLY, J., dissenting.

Charles R. Purcell and Daniel L. Houlihan & Associates, Ltd., both of Chicago (Daniel L. Houlihan and William J. Hennessy, of counsel), for appellants.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Thomas J. Bamonte, Assistant Corporation Counsel, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:
Plaintiffs State Bank of Countryside and Blackwater Construction Company (Blackwater) were the legal title holder and sole beneficiary, respectively, of a piece of property in Chicago. Plaintiffs filed a petition with the Chicago city council to obtain a change in the subject property's zoning classification from M1-1, restricted manufacturing district, to R-4, general residence district. After the city council denied the petition, plaintiffs filed a complaint for declaratory judgment against the City of Chicago (the City). They asked the court to declare that the zoning ordinance containing these classifications was unconstitutional as it applied to the subject property. After a trial, the circuit court entered judgment in favor of the City.

The parties raise the following issues on appeal: (1) whether the circuit court's conclusion that the City's zoning ordinance was valid was against the manifest weight of the evidence and (2) whether, to be valid, a zoning ordinance must bear a real and substantial relation to the public health, safety, morals, comfort, and general welfare or whether a rational relationship to a legitimate governmental interest is sufficient.

In their first-amended complaint for declaratory judgment, plaintiffs alleged that the M1-1 classification of their property did not bear any substantial relation to the public health, comfort, morals, safety, or general welfare. The classification was arbitrary and capricious, it deprived plaintiffs and the public of the property's highest and best use, it was a cloud on plaintiffs' title, and it violated the municipal zoning enabling statutes. Consequently, plaintiffs asked the court to declare the zoning ordinance invalid as it applied to their property and to grant them the right to develop the property as they had proposed.

Before the trial on the first-amended complaint, the parties submitted a set of stipulated facts to the circuit court. They stipulated that the subject property was a rectangular asphalt parking lot enclosed by a chain link fence. The size of the lot was 2.6 acres, and it was bordered by West 64th Place to the north, a public alley to the east, West 65th Street to the south, and Natchez Avenue to the west. Plaintiffs purchased this property for $650,000 in April 1994.

The parties further stipulated that plaintiffs petitioned the City for a zoning reclassification because the existing zoning classification, M1-1, did not permit the development plaintiffs proposed. They wanted an R-4 zoning classification in order to build a development containing 84 condominiums with 151 off-street parking spaces. Each unit in the proposed development would have 1,200 square feet and two bedrooms, and the average sale price would be $126,000. There would be six three-story buildings, containing 12 units each, and two three-story buildings, containing six units each. There would be 67 open parking spaces, and the remaining spaces would be in 14 six-car garages.

According to the stipulations, the proposed development was consistent with the use and bulk regulations under the R-4 zoning classification. The proposed development was consistent with other multifamily housing developments in the immediate area, and the M1-1 zoning classification was consistent with other manufacturing uses in the immediate area. North and east of the subject property were three-story apartment buildings on property with the R-4 classification. South of the subject property were manufacturing buildings on property in the Village of Bedford Park. This property was zoned as H-1, heavy industrial district. West of the subject property were buildings on City property with the M1-1 classification. Following a hearing, the city council unanimously denied plaintiffs' petition.

The parties further stipulated that John Barrett was qualified to render an expert opinion as a land developer and general contractor,

Terrance O'Brien was qualified to render an expert opinion as a real estate appraiser, Anthony McNamara was qualified to render an expert opinion as a registered professional engineer, and Stephen E. Roman was qualified to render an expert opinion as a registered architect and certified land planner.

At trial, John Barrett testified on behalf of plaintiffs. He testified that he was a representative of Blackwater and that Blackwater purchased the subject property in April 1994 from an industrial company. The property had been used as a parking lot for the industrial complex south of it, but it had been vacant for a number of years and was overgrown with weeds. Blackwater bought the property with the intention of building condominiums on it.

At the time Blackwater purchased the subject property, Barrett knew that it was zoned M1-1 and that this classification would not permit the proposed development. There was no zoning contingency in the contract to purchase the property.

Barrett further testified that he had developed 500 condominiums during his career as a developer. Thirteen years before the trial, he built 18 units to the east of the subject property. In 1984, he developed 12 condominium units at 63rd and Mobile, but he had developed no property in the area since that time.

Based on his experience, Barrett anticipated selling the condominiums to residents of the immediate and nearby areas. He expected that the buyers would be older residents and individuals who worked for the City. He had received no calls from individuals who were interested in purchasing a condominium in the proposed development.

Anthony McNamara also testified on behalf of plaintiffs. He stated that he was a consulting civil engineer and had been retained by Blackwater to analyze the suitability of the subject property for the proposed development. He determined that the property, including available sewer and water connections, was sufficient for the proposed development. He admitted that it would also be suitable for a manufacturing business.

Next, plaintiffs called Stephen Roman, a registered architect and urban planner, who had previously worked in the City of Chicago's Department of Planning for 32 years. During his testimony, he identified and referred to plaintiffs' exhibit 1, an aerial base map of the area surrounding the subject property. The exhibit showed the zoning classifications of the property on the map and the dates on which zoning classifications on different properties had changed.

Roman explained that, in 1957, when the City enacted the zoning ordinance, the strip between 64th Place and 65th Street, east of Oak

Park Avenue, and west of Austin Boulevard was zoned M1-1. After 1957, the classification of several of the parcels in this strip was changed from M1-1 to R-4. The classifications of six properties between Austin and Narragansett changed to accommodate apartment buildings. These changes occurred in 1965, 1967, 1968, 1969, 1974, and 1976. West of Narragansett, the classifications of three pieces of property changed from M1-1 to R-4; one change occurred in 1978, one in 1982, and one in 1995. On the north side of 64th Place, the classification of four properties had changed from R-2, single-family district, to R-4. These changes occurred in 1959, 1960, 1969, and 1972. Pursuant to these zoning changes, 732 dwelling units had been built.

Despite the fact that only one of these zoning changes had occurred since 1982, and the majority occurred in the sixties and seventies, Roman believed there was a trend toward multiple-family developments. In ascertaining this trend, he did not make an extensive examination of the area west of Oak Park Avenue between 63rd and 65th Streets, but he admitted that there was only one block in this area with an R-4 designation. East of Austin Boulevard between 63rd and 65th Streets and west of Central Avenue, there was also only one property with an R-4 designation.

According to Roman, the proposed development was consistent with the existing buildings and the trend of development in the area, although the proposed development included more "green space" and parking. In addition, the development would serve as a "buffer" between the single-family homes to the north of it and the heavy industry to the south.

Roman opined that, if the property continued to be zoned M1-1, it would remain vacant because only one industrial building had been built in the M1-1 strip between Oak Park Avenue and Austin Boulevard in the past 40 years. He explained that there was no market in the area for industrial development because the area was surrounded by residential areas. Also, the subject property was not suitable for industry because new industrial standards for development called for a minimum of five acres to accommodate trucks, expansion, and employee parking.

On the other hand, Roman found that there was a strong market for condominiums in the area. The basis for his opinion was his visits to two condominiums for sale. These were north of the subject property and had been on the market for two weeks at the time he visited them. He also spoke to a realtor at an open house at a condominium somewhere east of the subject property. He did not visit a new 18-unit development at 64th and Normandy. It was also his opinion that

the neighborhood was desirable because it had good access to transportation, good parks, and good schools.

On cross-examination, Roman admitted that, in addition to light industry, the M1-1 classification allows other uses, such as restaurants, business offices, professional offices, medical centers, and dental centers.

Terrance O'Brien, a professional real estate appraiser, also testified on behalf of plaintiffs. He stated that he was familiar with the value of properties in the area around the subject property because he had reviewed public records concerning the sales of homes, condominiums, and industrial properties in that area.

O'Brien testified that it was his opinion that, with its existing M1-1 zoning classification, the value of the subject property would be $2 a square foot, or approximately $250,000. He arrived at this number by considering the uses permitted under the existing classification and sales of similar properties in the area.

He was unable, however, to find any properties with an M1-1 classification for sale in the area depicted on plaintiff's exhibit 1. He examined two properties in Bedford Park, however, with M1-1 zoning. Both were smaller than the subject property. One was a mile from the subject property and sold in August 1993 for $1.88 per square foot, or $149,864.20. The other was half a mile away and sold in December 1994 for $1.36 a square foot, or $114,928.

It was O'Brien's opinion that, if the zoning classification were changed to R-4, the value of the subject property would be $6 per square foot, or approximately $750,000. He based this opinion on the uses permitted under an R-4 classification, the proposed development, the character of the area, the trend of development, other land uses in the area, the availability of public utilities, and sales of comparable properties with R-4 classifications. Ten single-family homes in the area depicted by plaintiff's exhibit 1 sold for $103,000 to $163,000. He testified that other condominiums in the area sold for $70 to $80 per square foot, but he could not recall the number of condominium sale prices he had examined in reaching his opinion. He did not analyze sales of condominiums in a new development at 64th Place and Normandy because the majority of his analysis had occurred before that property was rezoned in March 1995.

O'Brien also examined the market demand for the type of housing in the proposed development. He determined that there were not a lot of condominiums available in the area by driving around the area and noticing that there were not many for-sale signs. Also, he had noticed an appreciation in the value of condominiums. He acknowledged that the low turnover in the neighborhood could be

due to the fact that it is a mature neighborhood. He stated that he had considered new condominium developments in the area, but he did not know how many of the units in these developments were occupied or vacant.

Like Roman, O'Brien testified that there was a trend toward multifamily developments in the area. This opinion was based on the fact that all rezonings in the area since 1959 had been from R-2 or M1-1 to R-4. Also, O'Brien opined that the proposed development would not adversely affect the health or welfare of the community or the value of other properties in the area because there would be other multifamily developments around it. In addition, the sales price of the units in the proposed development would be similar, on a per-square-foot basis, to other homes in the area. According to O'Brien, the proposed development would put the subject property to its highest and best use because it would maximize the property value and would be in keeping with the trend of development and character of the area.

Plaintiffs concluded the presentation of their case with O'Brien's testimony, and the City then called Alderman Michael R. Zalewski to testify on its behalf. He testified that he was the alderman for the 23rd ward, in which the subject property was located.

Alderman Zalewski testified that he was familiar with the area surrounding the subject property because he had lived there since he was four years old and because he represented the area as an alderman. According to Zalewski, a multifamily development the size of the proposed development would not be in keeping with the character of the area, which was comprised of mostly single-family homes. The proposed development was also different from other multifamily developments in the area because of its size. In addition, developers of condominiums at 63rd and Melvina and 63rd and Harlem, as well as community groups, had expressed concerns about the number of vacant units in those developments.

Alderman Zalewski further testified that he was a member of the City's economic development committee. One of the goals of this committee was to attract businesses into the City to increase the tax base and to increase employment opportunities for residents of the areas in which the businesses were located. He testified that it was important to maintain land zoned as M1-1 to attract businesses to the area.

Zalewski admitted that the subject property had been vacant for many years, and he had been unsuccessful in attracting industrial users for M1-1-classified properties along West 65th Street in the area near the subject property. These properties were currently used

for a restaurant, a business, and parking lots for the industrial area across the street. Recently, however, businesses had relocated into other portions of the 23rd Ward, and one company that had relocated to 51st and Hamlin had pledged to work with community groups and to hire within the community.

After the trial, the circuit court issued an oral ruling in favor of the City. The court stated that, although plaintiffs presented the unrebutted opinions of three experts, the experts' testimony did not rise to the level of clear and convincing evidence that the zoning ordinance was arbitrary and unreasonable and had no substantial relation to the public's health, safety, and welfare.

The court stated that the experts did not adequately explain the bases for their opinions and that their opinions were largely unsupported by specific facts. The court noted that O'Brien did not have a written report, did not have his notes to support his opinions, and was unable to answer some of the court's questions. O'Brien also failed to demonstrate how long the subject property had been on the market before plaintiffs purchased it. Although the court found Roman to be a knowledgeable witness, it also found that his testimony did not demonstrate that the existing M1-1 classification was unreasonable.

According to the court, there was an inadequate basis for the experts' opinions that there was a need in the community for the proposed development. Also, plaintiffs' experts failed to explain to the court why there was no need in the area for the numerous other uses permitted by the M1-1 classification.

The court found that plaintiffs had proved that the proposed development was compatible with other uses in the area but found that the M1-1 classification was also compatible with other manufacturing uses in the area. The court acknowledged that the proposed development would make the land more valuable than it was as a parking lot, but the court was not convinced that the land should not remain a part of the M1-1 buffer zone between residences and heavy manufacturing, as it was originally intended. It also stated that it was not convinced that the area would not be better served by some of the other uses permitted by the M1-1 restriction. The court concluded that plaintiffs had purchased the subject property with no zoning contingency, and "highest and best use of property means more than the largest amount of money to the owner."

■ Zoning is primarily a legislative function (*Cosmopolitan National Bank v. County of Cook*, 103 Ill. 2d 302, 313, 469 N.E.2d 183 (1984)), and therefore it is subject to court review only for the purpose of determining whether the exercise of zoning powers involves an

undue invasion of private constitutional rights without a reasonable justification with respect to the public welfare. *Kleidon v. City of Hickory Hills*, 120 Ill. App. 3d 1043, 1046, 458 N.E.2d 931 (1983). A zoning ordinance is presumed valid, and a party challenging its validity must show by clear and convincing evidence that the application of the ordinance is arbitrary and unreasonable and bears no substantial relation to public health, safety, or welfare. *Racich v. County of Boone*, 254 Ill. App. 3d 311, 314, 625 N.E.2d 1095 (1993); see also *La Salle National Bank v. County of Cook*, 12 Ill. 2d 40, 46, 145 N.E.2d 65 (1957). A circuit court's determination as to the validity of a zoning ordinance is entitled to great weight, and a reviewing court will not overturn it unless it is against the manifest weight of the evidence. *Rosehill Cemetery Co. v. City of Chicago*, 114 Ill. App. 3d 277, 283, 448 N.E.2d 930 (1983).

■ In evaluating the validity of a zoning ordinance, courts examine the following factors, which our supreme court outlined in *La Salle National Bank v. County of Cook*, 12 Ill. 2d 40, 145 N.E.2d 65 (1957), and *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370, 167 N.E.2d 406 (1960): (1) the existing uses and zoning of nearby property; (2) the extent to which the particular zoning restrictions diminish property values; (3) the extent to which diminishing the plaintiff's property values promotes public health, safety, or general welfare; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; (6) the length of time the subject property has been vacant as zoned, in the context of land development in the vicinity; (7) whether there is a comprehensive zoning plan for land use and development; and (8) evidence of community need for the proposed use (*La Salle/ Sinclair* factors). *La Salle National Bank*, 12 Ill. 2d at 46-47; *Sinclair Pipe Line Co.*, 19 Ill. 2d at 378. The validity of a zoning ordinance depends on the facts of a particular case, and no one factor is controlling. *Oak Lawn Trust & Savings Bank v. City of Palos Heights*, 115 Ill. App. 3d 887, 892, 450 N.E.2d 788 (1983).

Plaintiffs argue that they met their burden of showing by clear and convincing evidence that the M1-1 zoning classification of the subject property bears no substantial relation to the public health, safety, or general welfare. According to plaintiffs, the circuit court's decision and application of the *La Salle/ Sinclair* factors were contrary to the manifest weight of the evidence.

Plaintiffs argue that the evidence presented under the first *La Salle/ Sinclair* factor, existing uses and zoning of surrounding property, supported their position that the existing zoning classifica-

tion was invalid. According to plaintiffs, their first exhibit and Roman's testimony showed a trend toward multifamily development. The City argues that plaintiffs failed to show that the area had become "so predominantly multi-family residential, that M1-1 zoning of the subject property was clearly unreasonable."

Under the *La Salle/ Sinclair* analysis, no one factor is controlling, but of paramount importance are the existing uses and zoning of nearby property. *Hamann v. Sumichrast*, 222 Ill. App. 3d 962, 976, 584 N.E.2d 847 (1991). With respect to the first factor, Roman and O'Brien testified that there was a trend toward multifamily development in the area. Plaintiffs also presented evidence that, in the corridor between 65th Street and 64th Place, Oak Park Avenue and Austin Boulevard, the zoning classifications of nine pieces of property had changed from M1-1 to R-4.

As the City points out, however, the majority of these rezonings occurred in the sixties and seventies. There was only one rezoning from M1-1 to R-4 in the eighties and only one in the nineties. Also, as the City contends, only three of the nine R-4 properties in this corridor extend from 64th Place to 65th Street like the subject property, and these three properties were rezoned over two decades ago, between 1969 and 1974. The recent decline in the number of rezonings and the timing of the rezonings of property similar to the subject property contradict plaintiffs' claim that there is a current trend toward multifamily development of properties like the subject property.

Plaintiffs assert, however, that the multifamily developments north of 64th Place also demonstrate the trend toward multifamily development in the area. But these properties were originally zoned R-2 for single-family use. While their rezoning may demonstrate a trend toward replacing single-family homes with multifamily homes, these properties do not show that there is a trend toward converting industrial property to multifamily developments, such that it is unreasonable for the subject property to retain its M1-1 restriction.

Plaintiffs further contend that any M1-1 buffer zone between residential property north of 64th Place and industrial property south of 65th Street has been replaced with multifamily developments, and consequently it was unreasonable for the court to conclude that the subject property should remain part of an M1-1 buffer zone. The evidence does show that a portion of the M1-1 buffer zone between 64th Place and 65th Street has been replaced by multifamily housing. For six of these nine pieces of R-4-classified property in this strip, however, part of the original M1-1 buffer zone separates the property from 65th Street. Another two of these pieces of property are

L-shaped, such that a portion of the original M1-1 buffer zone separates a portion of the property from 65th Street. The circuit court's conclusion that one of the existing uses of property in the area was as an M1-1 buffer zone between 65th Street and 64th Place is therefore supported by the record.

■ Not only did the evidence fail to show the existence of a multifamily development trend, but also, in the stipulated facts, plaintiffs agreed that the M1-1 zoning classification was consistent with other manufacturing uses in the immediate area. To successfully attack the validity of a zoning ordinance, it is not enough to show that the property could reasonably be zoned differently. *Littlejohn v. City of North Chicago*, 259 Ill. App. 3d 713, 724, 631 N.E.2d 358 (1994). Here, although plaintiffs may have shown that the subject property may have reasonably been zoned R-4, this was not enough to prove that the property's existing classification was arbitrary and unreasonable. Instead, their concession that the M1-1 restriction was consistent with other uses in the area supports a conclusion that the existing zoning was valid.

Under the second factor, plaintiffs argue that the existing zoning classification was unreasonable because it diminished the property value of the subject property. They rely on O'Brien's testimony that the value of the property was $250,000 with the existing classification but would be $750,000 if the classification were changed to R-4.

The City counters that O'Brien's valuation was flawed because, in valuing the property with the M1-1 restriction, O'Brien considered only industrial uses for the property and did not consider the other possible uses under the M1-1 restriction. Second, the City argues that a diminution in value is not determinative because zoning restrictions almost always result in a decreased value for property. Third, it contends, given that plaintiffs acquired the subject property with full knowledge of the restriction, they cannot rely on the loss of value from this restriction in order to obtain a zoning change. Finally, the City asserts that the fact that plaintiffs purchased the land for $650,000 in an arm's-length transaction suggests that this is the true value of the land under the existing M1-1 restriction.

O'Brien stated that he based his valuation of the subject property with the M1-1 restriction on an evaluation of permitted uses under this restriction and on the sales of comparable property in the area. He did not explain, however, how different uses might affect the valuation.

Also, he named only two pieces of "comparable" property. Both had the M1-1 restriction and were vacant, but other similarities between these properties and the subject property were not evident.

Both "comparable" properties were located in Bedford Park, one was a mile away from the subject property, and one was half a mile away. One sold almost three years before the trial, and the other sold almost 1¹/₂ years before the trial. In addition, both were significantly smaller than the subject property. O'Brien stated that he had examined comparable industrial properties in the Chicago area, but he did not give any information about these properties, and he testified that these other properties were not in the immediate vicinity of the subject property.

Also, in considering O'Brien's opinion that the subject property was worth $250,000 with the M1-1 restriction, we agree with the City that it is significant that plaintiffs paid $650,000 for the property with its existing classification.

O'Brien also provided few facts to support his opinion that, with an R-4 classification, the value of the subject property would be $750,000. Although he stated that he had arrived at this value by analyzing sales of condominium property in the area, he could not remember the number of condominium sale prices he had examined, and he had conducted the majority of his analysis before March 1994, over two years before the trial.

■ Even accepting O'Brien's valuation, however, it is well established that the fact property would be worth more if reclassified is not determinative in deciding whether to change the zoning because, in almost all rezoning cases, the subject property would be worth more if reclassified. *Glenview State Bank v. Village of Deerfield*, 213 Ill. App. 3d 747, 761, 572 N.E.2d 399 (1991). Moreover, as the City argues, plaintiffs were aware of the M1-1 zoning restriction when they purchased the subject property, and they purchased it without a zoning contingency in their contract. A purchaser who has full knowledge of a zoning classification when he purchases a piece of property cannot persuasively argue a loss of value due to that classification. *Oliver Construction Co. v. Village of Villa Park*, 257 Ill. App. 3d 750, 755, 629 N.E.2d 199 (1994).

Courts often consider the third and fourth *La Salle/ Sinclair* factors together. See *Oliver*, 257 Ill. App. 3d at 755. With respect to these factors, plaintiffs rely on O'Brien's opinion that there was no promotion of the public health, safety, or general welfare that justified the diminution of their property value.

The City responds that the existing restriction did benefit the public. It provided a buffer zone between residential areas and heavy industry and preserved land with which the City could attract businesses.

Although O'Brien testified that a change in the zoning of the

subject property and the proposed development would have no adverse impact on the community, Alderman Zalewski contradicted his opinion. The alderman testified that the M1-1 property in the area served the important purpose of buffering residential property from industrial property. He also believed that it was important to retain property with an M1-1 classification in order to attract businesses and, therefore, jobs, tax revenue, and community support. In addition, he testified that a multifamily development the size of the one plaintiffs proposed was not in keeping with the character of the neighborhood.

Zalewski's testimony supported the circuit court's conclusion that the M1-1 classification was valid. Although O'Brien's testimony conflicted with Zalewski's, where there is a conflict in testimony concerning the reasonableness of the zoning ordinance, the conflict relates to the credibility of the witnesses and the weight of their testimony, and the circuit court is in a superior position to resolve these matters. See *Firstbank Co. v. City of Springfield*, 253 Ill. App. 3d 844, 849, 625 N.E.2d 804 (1993).

There is no dispute as to the fifth factor, the suitability of the subject property for its proposed use. Under the sixth factor, to successfully challenge a zoning ordinance a plaintiff must show that the subject property is unsalable or vacant *"because of* the zoning classification" (emphasis in original). *St. Lucas Ass'n v. City of Chicago*, 212 Ill. App. 3d 817, 831-32, 571 N.E.2d 865 (1991). Plaintiffs argue that Barrett's testimony that the subject property had been vacant for several years shows that the property is vacant because of the zoning classification. Plaintiffs also argue that Roman's testimony showed that the existing zoning caused the subject property to be unsalable or vacant. He testified that there was no market for industrial property like the subject property and that the property would remain vacant if the zoning classification were not changed. The City argues that plaintiffs failed to present sufficient evidence concerning the property's marketability and the length of time it had been vacant.

The court stated that the plaintiffs' experts' testimony was "somewhat imprecise in *** the length of time this particular property has been in use along with how long it was on the property market before the plaintiff bought it [and] what other kinds of M1-1 properties in the area are not selling." The record supports this finding.

Barrett and Zalewski testified that the subject property had been vacant for several years, but there was no evidence that this was because of the M1-1 zoning restriction. Barrett testified that, before he purchased the subject property, an industrial company across the

street had used the property as a parking lot. It is not clear, however, why or when that company ceased to use the subject property as a parking lot and when it decided to sell the property.

Roman's testimony also did not provide the court with a sufficient basis for concluding that the subject property was vacant and not salable because of the M1-1 restriction. The court justifiably concluded that Roman had not provided a "convincing presentation that the current M1-1 classification is unreasonable." Although Roman testified that the subject property was not salable because it was unsuitable for industrial uses, the M1-1 restriction permitted other uses. There was no evidence that the subject property was unsuitable for these other uses. There was also no testimony concerning the marketability of other properties in the area with the M1-1 classification.

Turning to the seventh factor, the parties agree that the existing classification of the subject property is part of a comprehensive zoning plan. Under the eighth factor, however, they disagree as to whether there was a need for the proposed development.

The court stated that there was an inadequate basis for the plaintiffs' experts' opinions that there was a need for the proposed development and that these experts failed to explain why there was no need for the numerous uses the M1-1 classification permits.

Plaintiffs object to the court's statement that they should have offered testimony concerning other uses permitted under the M1-1 restriction. The court stated: "There are multiple other uses that the experts did not tell me would serve the community less than what is proposed." According to plaintiffs, it was unfair to require them to prove a negative, and the City should have had the burden of showing the need for other uses. Plaintiffs had the burden of proof of showing that the M1-1 classification was unreasonable, however, and the failure of their experts to discuss uses other than industrial uses for the subject property prevented them from meeting this burden.

The record also supports the court's finding that plaintiffs' experts did not provide sufficient bases for their opinions that there was a need for the proposed development. Barrett testified that he expected to sell the condominiums in the proposed development to residents of the nearby area. His opinion was based on his experience as a developer, but he testified that he had built no condominiums in the area since 1984. He also admitted that he had received no calls from individuals who were interested in purchasing units in the proposed development.

Roman testified that there was a strong market for condominiums in the area around the subject property, but his opinion was based

only on visits to three condominiums for sale, two across the street from the proposed development and one somewhere east of the development. O'Brien's opinion that there was a demand for condominiums in the area was similarly unsupported. The basis for his opinion was that there had been an appreciation in the value of condominiums in the area and that he had not seen many for-sale signs as he drove around the area. Although he testified that he had considered new condominium developments in assessing the demand for this type of housing, he did not know how many of the units in these developments were vacant.

In addition, these experts' opinions were contradicted by Alderman Zalewski's testimony that community groups and new condominium developers in the area had expressed concerns about condominium vacancies.

Plaintiffs ascribe error to the court's finding that their experts' testimony was unpersuasive with respect to this factor, as well as the other factors. An expert's opinion, however, is only as valid as the bases and reasons for that opinion (*Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 715, 633 N.E.2d 111 (1994)), and the record supports the court's conclusion that plaintiffs' experts failed to provide sufficient bases for their conclusions.

■ After reviewing all the relevant factors, we conclude that plaintiffs failed to show that the M1-1 zoning restriction was invalid with respect to the subject property. Although the property was suitable for the proposed development, and the value of the property would be less under the existing zoning than under an R-4 classification, plaintiffs were aware of the zoning restriction when they purchased the property. In addition, the evidence showed that the existing zoning was consistent with other manufacturing uses in the area, that the property was part of an M1-1 buffer zone, and that the availability of commercial property benefits the community. Furthermore, there was insufficient evidence that the subject property had remained vacant because of the existing zoning classification or that there was a need for the proposed development.

The record, therefore, supports the circuit court's conclusion that the plaintiffs failed to show by clear and convincing evidence that the M1-1 restriction is arbitrary, unreasonable, and bears no substantial relation to public health, safety, or welfare. At the very most, the reasonableness of the subject property's M1-1 classification was debatable under the evidence presented at the trial, and where opinions differ as to the reasonableness of a zoning restriction, a court must defer to the legislative judgment (*Michalek v. Village of Midlothian*, 116 Ill. App. 3d 1021, 1034, 452 N.E.2d 655 (1983)). For these reasons,

the circuit court's ruling was not against the manifest weight of the evidence, and we affirm it.

In addition to arguing that the ordinance is valid because it bears a substantial relation to public health, safety, and general welfare, the City asks us to declare that the ordinance would also be valid if it merely bore a rational relationship to a legitimate governmental interest. Given our decision that the ordinance in this case is valid under the "real and substantial relation" standard, we need not decide whether it would also be valid under a less stringent standard. Although we express no opinion on the appropriateness of a rational relationship standard in zoning ordinance cases, we note that existing Illinois Supreme Court and Appellate Court precedent supports our application of the "real and substantial relation" test in this case. See, *e.g., Harris Trust & Savings Bank v. Duggan*, 95 Ill. 2d 516, 532, 449 N.E.2d 69 (1983); *La Salle National Bank v. County of Cook*, 12 Ill. 2d 40, 46, 145 N.E.2d 65 (1957); *St. Lucas Ass'n v. City of Chicago*, 212 Ill. App. 3d 817, 822, 571 N.E.2d 865 (1991); *Equity Associates, Inc. v. Village of Northbrook*, 171 Ill. App. 3d 115, 122, 524 N.E.2d 1119 (1988); *Michalek v. Village of Midlothian*, 116 Ill. App. 3d 1021, 1034, 452 N.E.2d 655 (1983).

Judgment affirmed.

RAKOWSKI, J., concurs.

JUSTICE TULLY, dissenting:

I must respectfully dissent. While I have no quarrel with the majority's recitation of the applicable law, I cannot accept its conclusion that the trial court's findings are not against the manifest weight of the evidence.

As the majority correctly noted, the validity of a zoning ordinance is subject to review under the eight factors outlined by the Supreme Court of Illinois in *La Salle National Bank v. County of Cook*, 12 Ill. 2d 40 (1957), and *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370 (1960). See 287 Ill. App. 3d at 915. However, after reviewing the evidence put forth by plaintiffs and the City, I believe that the trial court and the majority have reached an incorrect result.

With regard to the first *La Salle/Sinclair* factor, the existing uses and zoning of nearby property, the best witnesses are the adjoining properties. See *Aurora National Bank v. City of Aurora*, 41 Ill. App. 3d 239, 244-45 (1976). In the instant case there has been a clear trend toward multifamily development in the area of the parcel plaintiffs wish to develop. Since 1969, the City has permitted nine

parcels to be rezoned to R-4. The majority opinion diminishes the significance of this trend by pointing out that a number of these rezonings were done in the 1960s and 1970s and that only a couple occurred in the 1980s and 1990s. However, anyone familiar with real estate development knows that it can take decades for a neighborhood's character to develop. Moreover, real estate development is particularly vulnerable to business cycles and interest rates. The fact that the trend is drawn out over a few years is irrelevant. Clearly, the trend is there and, thus, this factor weighs in favor of plaintiffs.

The evidence about the second factor, reduction of property values, also weighs in favor of plaintiffs. The real estate appraiser, Jerry O'Brien, testified without contradiction that the value of the property at the time of trial was about $250,000, while it would be worth $750,000 if zoned R-4. Moreover, there was evidence presented that there was no industrial market for the lot in light of its relatively small size and of the ongoing residential development in the neighborhood.

With respect to the third and fourth factors, the promotion of the public health, safety or general welfare, I believe there is nothing in the record that significantly bolsters the City's position. Rather, I believe the opposite is true here. Surely, the interests of the people of the 23rd ward and of the city at large are better served by the creation of more homes and the expansion of home ownership within the city. I absolutely cannot believe the neighborhood is better off with this land being used as a parking lot or in its current capacity as a dump.

As for the fifth factor, the suitability of the property for its proposed use, it is undisputed that the property is perfectly suited for the construction of multifamily residential residences. Thus, this factor also weighs in favor of plaintiffs.

The sixth factor relates to the length of time that the property has been vacant. While it is true that the record does not reveal exactly how long the property has been vacant, it is clear that it has been a long time. The trial court expressed concern about the lack of evidence on this point, but the key question is not how long the lot has been vacant, but whether it will ever again be viable for its former use. In view of the nearly nonexistent industrial development in the area, it seems unfortunately clear that an industrial renaissance in the 23rd ward is not on the immediate horizon.

Under the seventh factor, the community's care in planning land use development, it is without question that the City has exercised great care in the creation and administration of its comprehensive zoning ordinance. However, that ordinance was enacted 40 years ago

during an unprecedented post-war economic and industrial expansion. Since that time great economic change has transformed our economy from a primarily industrial economy to a more mixed economy in which the service sector has a much more substantial role. In light of these profound changes, common sense would seem to suggest a continuation of the City's recent policy of allowing more multifamily residential development.

Finally, the eighth factor is the community's need for the proposed use. Respecting this factor, I believe plaintiffs provided more than sufficient evidence of a need for this type of development. I cannot imagine that Chicago needs another dumping ground.

In closing, on a more general note, I find it perplexing that at a time when markets and economies are opening up in Eastern Europe, Latin America, Asia and throughout the world at the encouragement of the United States government, we continue to straightjacket in regulation the entrepreneurial spirit here at home.

Thus, I believe that the trial court erred in refusing to rezone the subject property to R-4. I would, therefore, reverse the circuit court's judgment and remand for further proceedings consistent with this view.